Mr. Ortiz. Mr. Chief Justice, and may it please the Court, this case concerns who counts and who does not count as a supervisor under Title VII. The parties in the United States agree that the Seventh Circuit rule violates the holding of Farragher, the reasoning of Farragher, and this Court's other central Title VII precedents, including Burlington, Northern, and Stout, and the common-sense meaning of   The parties even agree, as to the general legal standard, although they style it a little bit different, differently, that those harassers whose employer-conferred authority over their victims enables or materially augments the harassment should count as supervisors. This is not a standard, Your Honor, that imposes automatic liability on employers. Victims must still prove actionable harassment, and employers can still take advantage of the Ellerth-Farragher affirmative defense. Let's say you have a workroom, there are five people who work there, and the employer has a rule that the senior employee gets to pick the music that's going to play all day long. And the senior employee says to one of the other employees, you know, if you don't date me, I know you don't like country music. If you don't date me, it's going to be country music all day long. Now, that affects the daily activities of that other employee. I would have thought under your theory that means that that senior employee is a supervisor. No, Your Honor, because in that circumstance, the adverse action would not amount to, would not be severe, or perhaps it would be pervasive, but it would be pervasive. That could be far more severe than, for example. Hard rock instead of. It could be far more severe than simply saying, all right, you know, you're going to, as in this case, you're going to be cutting the celery rather than, you know, baking the bread or whatever. Well, no, Your Honor, this is, the severity is an objective standard, it's not subjective. So in this case, someone's intense dislike, maybe it's debilitating, subjective dislike of rock music, some forms of country music might impair their performance some in the workplace, but from an objective reasonable employee's standpoint, I don't believe that that would be the case. Not all of them. Roberts, but I mean, there are places where the environment, you know, an assembly line or something like that, where the task may not be that different, but how the environment in which you have to perform them may be far more significant than whether or not you're attaching the door handles or the front fenders. Oh, for sure, Your Honor, but it has to be judged on a case-by-case basis. Well, exactly, and I would have thought the benefit of the Seventh Circuit's test was that you don't have to go through those case-by-case bases. I think we can have a reasonable debate about whether the music you have to listen to for 8 hours is objectively a significant enough interference with the daily activities to qualify under your test. But the Seventh Circuit test makes clear, doesn't give any kind of immunity, it just makes clear what type of analysis is going to be applied to the allegation. Well, Your Honor, the Respondent actually exaggerates the determinativeness of the Seventh Circuit rule and the indeterminateness, supposed indeterminateness and unpredictability of the Second Circuit rule. The Seventh Circuit itself has recognized, the judges on the Seventh Circuit itself, has recognized that the rule does not really well fit the realities of the workplace. It also just moves uncertainty from one category to another. The category of supervisor may be a little bit tidier, but under the Seventh Circuit's approach, the category of coworker is very unpredictable. The Seventh Circuit itself in Doe v. Oberweiss-Darys recognized that once you move people who can take this, have this kind of power over their victims, but can't actually take tangible employment actions against them into the category of coworkers, all of a sudden you have to apply a sliding scale of negligence. Not only that, but the jury is the one who applies it. So for those categories, this exact category of employee, Your Honor, the employer going forward has very little idea of whether what standard of care is that a particular jury would apply in that case and whether the jury would decide that it is met or not. The Seventh Circuit rule in the overall is no more determinate than the Second Circuit rule. Also, Respondent points to no cases in the Second Circuit or the other circuits that have adopted this rule where courts have identified problems with its application. And that indeed is not the case. Alitoson Could you explain what the materially augments rule means? Could you provide a definition of that? The authority to assign daily tasks has to be sufficient to do what? It has to be sufficient to enable the harasser to instill either fear in the victim that the victim should not turn the harasser in, or that it may have to do with the harasser's ability to control the physical location of the victim. That can augment the harassment. If a harasser can steer a victim to a location where the harasser has an opportunity to harass and indeed may have an opportunity to harass without other employees or other people in the company seeing in, that would materially augment the harm. There are situations where the assignment of responsibilities is extremely unpleasant, and so it's easy to see how the test might apply in that situation. But there are also a lot of situations like the Chief Justice's example where it's really very unclear. I don't know how courts are going to go, how courts can grapple with that. You said that being subjected to country music or hard rock or Wagner, you know, every single day in the workplace would not be sufficient. I don't know. Some people might think that it was, that that is. Justice Alito, this part of the standard, in particular the materiality requirement, is meant to track this Court's standard in Burlington Northern, where it said that only actions that are materially adverse to the employee could count. And this Court identified the materiality requirement there as actually working to make the standard more objective. Ginsburg. Ms. Ortiz, why isn't the question that you're presenting academic in this case? Because didn't the district judge say that there had been no showing that Davis's conduct was sufficiently severe or pervasive? Wouldn't matter to the supervisor if the conduct was not sufficiently severe or pervasive in no harassment, and equally, if the company responded every time a complaint was lodged. The district court found both of those things, that it wasn't severe and pervasive, and that every time she claimed, complained, an investigation was made. Justice Ginsburg, we actually tried to bring those things up before the Seventh Circuit, and we found that the district court was not able to do that, because of its holding as the supervisory liability. If this Court were to reverse the Seventh Circuit's affirmance of summary judgment of the district court, the case would then be remanded to the Seventh Circuit, where it could either look at these alternative — these other holdings, or the thing would be — it could be remanded at that point and directed back to the district court for another look. The district court's reasoning, the Seventh Circuit noted, when it was talking about other incidents of harassment, was very unusual. What the district court did was it divided all of the incidents into two categories. One category consisted of events that by themselves were not overtly racial in nature, and the other category consisted of those events that were overtly racial in nature, where a racial epithet had been hurled at someone, for example. And it said with respect to the first category, the events that on their face did not announce racial animosity, that there wasn't any racial nexus, so they didn't count, and swept all those events out. And it looked at the remaining ones where the connection to racial animus was overt, and it said, well, these, there may be some, but they just don't count. So the Seventh Circuit itself discredited the reasoning of the district court in those very holdings. Kagan Mr. Ortiz, suppose I agree with your standard, but I just can't find on the record as it's been presented in this Court any evidence that Davis actually served as Vance's supervisor. I mean, what's your best so I'm, so if that's true, I would be tempted to actually just decide the thing rather than to remand it. So as against that approach, what's your best evidence that there was a supervisory relationship under your standard here? Ortiz First, Justice Kagan, it is important to keep in mind that the record was developed under the wrong legal standard. But even considering that.  In that case, is there evidence that you did not present because the Seventh Circuit applied a different standard? Ortiz There was evidence that was probably not developed below because the Seventh Circuit standard was so absolute. But there is actually evidence in the record. We believe plenty of evidence, evidence sufficient, certainly, to overcome summary judgment, although perhaps not enough for partial summary judgment on this question. Ginsburg What other than the job description? The job description says that the catering specialist has authority to direct or lead the part-time employees. But what concrete instances of Davis exercising supervisory authority over Vance is there in this record? Ortiz Well, Justice, there's two separate questions, Justice Ginsburg. One is instances of it. Others is just whether she has the authority or not. Because this Court has held in Farragher itself that it's the authority that makes the difference, not the actual exercising of it in a particular case. But let me go through what's in the record now, much of it which is in the joint appendix, but not all, because we weren't aware that we would be opposing the summary judgment motion before this Court. First, William Kimes, who is the director of the University Banquet and Catering Division, the sort of head of this 60-some-person department, two employees testified that he told them that Davis was a supervisor. One of them was Vance. That can be found on page 198 of the joint appendix. Another is an employee who is in Vance's position named Don Knox, and that statement can be found on page 386 of the joint appendix. William Kimes himself testified in his deposition that Davis, quote, directed and led other employees in the kitchen. That can be found on page 367 of the joint appendix. In an internal investigation by compliance officers, if all states. Ginsburg. What I mean is not the statement, well, she's a supervisor, but comparable to Farragher, where the lifeguard who didn't have authority to hire or fire said, if you don't date me, you're going to be cleaning the toilets. We don't have anything like that in this record. Well, there was no overt threat like that in the record. But the person who was hurling racial epitaphs at her was in a position of authority over her, both according to the job description, also according to her understanding, according to the job description. But that would also, that would be for a very confined period. It would only be when the, when Vance was a part-time employee. When she's, when she's a full-time employee, there isn't that. No, Your Honor. There's two separate provisions in the job description which cover the whole period of time here. The harassment started around September 2005, went in through, went to August 2007 with one incident on March 1st, I believe it was, 2008. On January 1st, 2007, Ms. Vance received a promotion from part-time to full-time. Page 13 in the joint appendix has this item that you pointed to, Justice, which specifically lists among the duties and responsibilities of the catering specialist leading and directing part-time employees. However, page 12 of the joint appendix lists under position supervised by the catering specialist exactly Vance's position. So when she moved from full-time, sorry, from part-time to full-time in January 2007, the supervisory nexus in the job description merely jumped from page 13 to page 12. But it was covered for that whole period of time. Alitoso, what was the most unpleasant thing that Davis could have assigned the Petitioner to do? Maybe chopping onions all day, every day? Certainly within the job duties that she traditionally did, the kind of things she had to work with, what she had to do, things like this, working with onions, chopping onions all day might be punishment. Unfortunately, again, though, the record wasn't developed under an understanding that, you know, all of this would be relevant. Alitoso, that would materially augment chopping onions all day would be enough? Yes, Your Honor. Chopping. How about chopping other things? Just chopping. You're the sous chef. You're going to be chopping all day, every day. Would that be enough? Possibly, Your Honor. It depends, again, on questions which would depend upon, you know, how you had to chop, how heavy the knives were, what you would get for tantrum injury. Did she ever have that authority? Because the record, as far as we have it, says that the work assignments, what Vance was doing, came from the chef or from chimes, and the most that Davis did was transmit the chef's orders of where people would be stationed. Your Honor, it is not quite clear at this point. That, in an internal investigation at Ball State University, Ms. Vance told the compliance officer who was conducting the investigation that Davis delegated jobs to her in the kitchen. That appears in document 59-16 on page 2. Counsel, may I interrupt a moment on, following up on an issue raised in part by the employee, that Davis was a direct supervisor, would there be an affirmative defense available to the employer? For sure, Your Honor, there would be a affirmative defense. That would be your position? Yes. That this could not be grounds that someone who directs an employee's day-to-day activity should be treated like someone who hasn't actually undertaken the threat because the situations are different? Yes, Your Honor. This is — this falls out of the structure of the affirmative defense as laid out in Ellis and Farragut. Is that what this fight is about? What if we were to say that the EEOC's test governed or the Second Circuit test governed, but because of the nature of the difference between formal supervisors who take tangible work activities and informal supervisors who the employer would have less control over and less knowledge about their activities, that we would require an employee to complain? Would that be a crazy rule, and why? This Court would require under those circumstances? Would require, would permit the affirmative defense to be raised by the employer. It doesn't actually map on well to the structure of the affirmative defense as laid out in Ellis and Farragut. No, but there's a difference between those supervisors who take direct activity, tangible direct actions who are empowered to do that, and supervisors who don't have that power, because supervisors who don't have that power are supervised their actions are supervised in a way that non-tangible employment supervisors are not. Right. But under the existing affirmative action, the affirmative defense, as I understand it, Your Honor, an employee who doesn't complain, unless they are reasonable in not complaining, in most cases would make the affirmative defense unavailable to the employer. Is it a question concerning the difference between unreasonably failing to complain? No, it's whether, whether or not this whole fight is over that issue. That, this whole, the fight is in part about that issue, but certainly not the only. No, because it's also about the burden of proof. Yes. So if we keep the burden of proof with respect to the employer raising the affirmative defense, does that solve half your problem? Yes, Your Honor. It makes it better. And this Court has recognized that the affirmative defense appropriately sort of allocates the burden between the employee and the employer going forward. Your Honor, the Seventh Circuit rule, although unsupported by Respondent, is supported by several of Respondent's meekie. As I said, they tend to oversell the determinantness of the Seventh Circuit rule. They exaggerate the, the uncertainty that they predict will happen under the appropriate section. Sotomayor, what you see is the major difference between the EEOC and the Second Circuit rule, and why one is compelled over the other? Sotomayor, it's the regulatory agency charged with oversight of the, of the implementation of the statute. Why shouldn't we give deference to it on the standard it sets? Your Honor, it is entitled to deference under Skidmore, no more. And it's not our understanding, although the government corrects it. Excuse me, why no more? Why just Skidmore? Because it's only an informal guidance. Your Honor, it hasn't gone through rulemaking, formal adjudication, those processes which elevate the amount of deference. Scalia That's an absolute rule? Sotomayor, it's a little bit contentious on this Court. Scalia No. Your Honor, it's a little bit contentious on this Court. But following sort of Meade products, for example, it wouldn't be entitled to more than Skidmore deference. Ginsburg You answered the argument it shouldn't get any deference because what the EEOC guidance does is it is interpreting two decisions of this Court, and this Court, not the EEOC, is in the best position to determine what those two cases mean. Well, what it is, Your Honor, is it represents an interpretation of the word ''agent'' in Title VII. Now, where the statute, statutory term, gives off and this Court's interpretation begins is in some cases a tough question. But in this case, the EEOC is really giving definition to the word ''agent'' in Title VII, not so much this Court's interpretations in Farragher and Ellerth. If there are no further questions, Your Honor, I would like to reserve my remaining time for rebuttal. Thank you, counsel. Mr. Srinivasan. Thank you, Mr. Chief Justice, and may it please the Court. When a person controls a subordinate's daily work activities in subjection to harassment, that person qualifies as a supervisor for purposes of the Farragher Ellerth vicarious liability affirmative defense framework. When it controls daily work activities and therefore, for example, can compel the cleaning of toilets for a year, the principle that the agency relationship augments the ability to carry out the harassment is implicated in that the victim will lack the same ability to resist the harassment or to report it, as would be the case if the harassment were conducted by a coworker. What about the music hypothetical? Well, where do you think your test comes out on that? I think it comes out most likely against concluding that the person is a supervisor. And the reason is that under the EEOC enforcement guidance, it accounts for situations in which the authority is exercised over a limited field, a limited number of tasks or assignments, and this is at page 92A of the petition appendix. And I think that would qualify under that provision because it's limited. It doesn't really have to do with the number of tasks. It isn't an assignment or task. It's something that clearly affects the daily activities of the employee in a way that could be used to implement or facilitate harassment. It could, Your Honor. I don't disagree with that and I don't disagree that there are going to be cases that raise issues at the margins. But one way to think about the spectrum of options available to the Court today is to envision that on one end you have harassment that's perpetrated by a coworker and you consider the types of harassment that that might entail. And on the other end, you have harassment that's perpetrated by a supervisor with authority over tangible employment actions. Roberts. And your test sort of views that, just as you've posted, as some broad continuum in which we're going to have countless cases trying to figure out whether music falls closer to this end or, you know, what the senior employee controls the thermostat, is that closer to this end or that end, or cutting onions. It seems to me that every single case has its own peculiar facts and courts are going to have to figure out where on the continuum it resides. Well, I guess, Your Honor, as Your Honor put it to Petitioner's counsel, the competing approach would be the approach adopted by the Seventh Circuit. But that approach has some serious flaws. For example, it wouldn't cover the supervisor's conduct that was at issue in Fairgard itself, where the supervisor threatened that he would make the harassment victim clean the toilets for a year if she didn't succumb to the harassment. Isn't cleaning the toilets a limited – isn't the authority to decide who cleans the toilets the same as the authority to decide what the music is going to be? It's one thing. And your answer on the music was, well, that probably wouldn't count because it's the authority to decide just one thing. Well, we don't – I guess we don't know enough about the threat to force her to clean the toilets for a year to know whether it's only one thing. But it's – it could be, for example, that if there, in the scope of a particular day, you have three particular options as to what you might do, monitor the beach, clean the facilities, including the toilets, or prepare meals, then it's something  Alitoso, your argument is if the only authority was to decide who cleans the toilets, then that would not – that wouldn't count because that's just one thing. No, I think that – I don't think we have an answer to that until we know how much of the day's work is encompassed by cleaning the toilets. But I thought in Fairgard it was that the lifeguard gave her her daily work assignments. He controlled what she would do on the job. He controlled every aspect of her – of her day's work, and cleaning the toilets was one aspect of it. So that was a particularly poignant example that he visited on her as a way to perpetrate the harassment. Alitoso, you can't possibly be what the case means. Suppose that it's the assignment of offices, and all of the offices except one have heating and air conditioning, but one has no heating and no air conditioning. And so the – and that's the only authority that this person has, is to assign desks. That person says if you don't do whatever it is that I want you to do, I'm putting you in the office where there's no heating and there's no air conditioning. And you would say that doesn't count because it's just one thing. It's not a broad range of authorities – of authorities. It doesn't constitute authority over daily work activities. And I guess that's what the EEOC guidelines are. We haven't encountered in real cases. Well, you've looked this up, and apparently for about a dozen years, the EEOC has had, as an alternative basis for qualifying as a supervisor, the individual has authority to direct the employee's daily work activities. And in addition, we have three circuits that for some period of years have been following roughly the same kind of rule. Now, has this problem of the country music or the other problems raised, have they turned out to be a significant problem in those circuits or for the EEOC? They haven't, Justice Breyer. They have or they have not? They have not. I'm sorry. They have not turned out to be an issue. And that's what I was talking about. How do you know that? Are you just saying they have not generated actual Federal court reported cases? Do you have any idea how this works on the ground when people complain about the exercise of authority by a coworker who has specific responsibilities that might be reviewed as supervisory? Well, they haven't. I guess I have two components to the answer, Mr. Chief Justice. They haven't generated reported or underreported decisions as far as we've seen. And this is nonscientific, and it's just based on our conversations with the EEOC lawyers who are charged with dealing with right-to-sue letters and the like. They haven't encountered these sorts of situations. The EEOC lawyers think the EEOC plan is working just fine. Well, that – I understand that that's not terribly surprising, but. But I guess they'd tell you. There are three who signed the brief or four, and I guess they'd tell you, wouldn't they, what the problems are if they have problems. Right. And our conversations with them about the way in which these issues arise. I mean, we can ask the other side the same question. They've seen the cases in the circuits. Have they seen instances in the EEOC or before the circuits where it's turned out to be a serious problem like the country music or any of the other hypotheticals raised? And I don't think it has, Justice Breyer. And I think it's important to bear in mind that the nature of this inquiry is such that there's going to be cases at the margins that raise difficult questions. But in Ellis, the court recognized that. But could I ask you how the Seventh Circuit test works in operation? We're in a university setting here, so let me give you a university hypo. There's a professor and the professor has a secretary, and the professor subjects that secretary to live in hell, a complete hostile work environment on the basis of sex. All right? But the professor has absolutely no authority to fire the secretary. What would the Seventh Circuit say about that situation? That if there's no authority over to direct cancel appointment actors in the Seventh Circuit? No, no. The secretary is fired by the head of secretarial services.  But professors don't have the ability to fire secretaries. Professors do have the ability to make secretarial lives live in hells. So what does the Seventh Circuit say about that? The professor would not qualify as a supervisor for purposes of the Ellis fair framework. Under the Seventh Circuit test. So you look at her as a co-worker. You look at the professor as a co-worker, and you'd apply the same standards that apply to harassment conducted by a co-worker. Even though, of course, it's actually more difficult for the secretary to complain about the professor than it would be for the secretary to complain about the head of secretarial services. Yes. And I think that's a useful frame of reference that I was trying to articulate earlier, which is that we can envision the cases as falling on a spectrum between ability to complain when the harassment is perpetrated by a co-worker on one end, and ability to complain when harassment is perpetrated by a supervisor with a containable employment authority. And, Mr. Prunoff, if I could just continue on about the Seventh Circuit test. Of course, I just don't even understand the Seventh Circuit test. Would the Seventh Circuit test also say that that person is not a supervisor, even if the professor evaluates the secretary on a yearly basis? The Seventh Circuit would say that, as far as we can tell. They don't appear to have a proviso for circumstances in which the harasser has a role in determining tangible employment actions, because that's one thing that the EEOC guidance also takes account of. It's that not just that somebody counts as a supervisor when they themselves undertake a tangible employment action, but if they have a substantial role in making recommendations that in turn trigger tangible employment actions, the EEOC would take the position that that qualifies. Now, that's not an issue in this case, but that's your quote. Roberts You've talked several times about this going along the spectrum. Where are we supposed to cut off the – where's the cutting line in the spectrum? Well, I think that the control over daily work activities is where we would draw the line. And that's what's come up the most in the cases. The reported decisions have conflicts on – have a conflict on that issue, and that's where the EEOC guidance draws the line. Now, I think it would be helpful if the Court were going to issue an opinion that adopts that line to elaborate on that line a little bit in the following sense, that relaying instructions that are – that are disseminated by one person wouldn't count for those purposes. That's in the EEOC guidance. And job – and it's the functions of a job that actually matter, not the job title. That's also in the EEOC guidance. So I think there are some aspects of the EEOC guidance that elaborate on that line about control over daily activities that I think I would commend to the Court that it might well include. Sotomayor Do we have a developed record enough to do that in this case? Roberts I'm sorry, I didn't hear you. Sotomayor Do we have a developed record enough? Petitioner's counsel says we don't, that the Seventh Circuit test didn't permit them to develop the record sufficiently to clarify all of these issues. We certainly have snippets or lack snippets, as the case may be. But is the record sufficiently developed for the Court to even pronounce – make pronouncements of that nature? I think the real question, Justice Sotomayor, is whether the parties had a sufficient opportunity to develop the record, because if you take the record in the case as a given, we think that the record would support the grant of summary judgment for Ball State University, because there isn't a sufficient showing in the record, if you take it as a given, that the relevant supervisory – the relevant putatively supervisory employee, Davis, had control over day-to-day work activities. The question that remains is whether the record should be allowed to be expanded. The conclusion in your brief is that the judgment of the court of appeals should be vacated, in the case remanded for further proceedings, and now you're telling us that we should basically write an opinion on summary judgment? No. I think if you take the record as a given, the grant of summary judgment in favor of the employer would be in order. But in the normal course, what this Court does when it announces a new standard is it remands for the lower courts to deal with the application of that standard to the facts, and the conclusion in our brief is just, I think, a parodying of that normal conclusion. Thank you, counsel. Mr. Garre. Thank you, Mr. Chief Justice, and may it please the Court. The judgment of the court of appeals should be affirmed because the record establishes that the only employees whose status is at issue lack the supervisory authority necessary to trigger vicarious liability under Title VII. We took this case to decide whether the Farragher and Ellerth supervisory liability rule is limited to those harassers who have the power to hire, fire, demote, promote, transfer, or discipline their victim. And your answer to that is no. Is that right? That's right. We don't think the Seventh Circuit test is the complete answer to the question of who may qualify as a supervisor, but we think it's clear that the person whose status is at issue did not qualify, and therefore the judgment should be affirmed. Alito, if we agree with that, without having any party defending the rule that was adopted by three circuits, then surely, then why shouldn't we just remand this case for the lower courts to decide this summary judgment issue and permit further development of the record if the record isn't fully developed? Well, most importantly, Justice Alito, because the courts need guidance on how to apply the EEOC or the Second Circuit standard. The best way to provide that guidance is to do what this Court often does, which is to apply the facts to the standard. In this case, applying the record facts to the standard that we think applies, that materially enables the harassment standard, it's clear that Ms. Davis, the person who is at issue, does not qualify as a supervisor. And the reason why it's clear is the record is uncontradicted that either the shaft or Mr. Kime made the daily assignments through the prep sheets. The prep sheets are what every employee in the kitchen got each day, and they would tell you, dice vegetables for 60 people, prepare box lunches for 20, prepare six vegetable trays. That was their daily assignments, and the record is absolutely clear, JA-277 to 78, JA-424, that all the employees got the prep sheets from the chef or Mr. Kimes. It's also absolutely clear that Mr. Kimes was the one who controlled the schedule in the kitchen. He's the one that told employees what times of days that they could work. He controlled the schedule. Alito, I understand Mr. Ortiz has said that there's at least a dispute of fact about whether Davis could have controlled what the Petitioner did on a daily basis. There's neither a material nor genuine dispute on that, Your Honor. At the very most. Doesn't your job description say that she can assign tasks in the kitchen? But they omit the clause that follows, which is critical, which is via demonstration, coaching, or overseeing to ensure efficiency. That's on page Joint Appendix 13. And that job description has to be read in light of the record that makes crystal clear that it was the chef who did the daily assignments per the prep sheets. And there are examples of the prep sheets as an exhibit to Ms. Fultz's affidavit. The affidavit's at 424 of the Joint Appendix. The exhibits are LLL and JJJ, which contribute to this case. Scalia's case to decide those factual questions? Your Honor, you really didn't. We took it principally to decide whether the Seventh Circuit rule was right or not. And you don't even defend that. So there's nobody here defending the Seventh Circuit. Well, Your Honor, has excellent briefing defending the Second Circuit. The Chamber of Commerce and other amici have defended it. We certainly think that it's a superior by law. They're not talking to us here, are they? No, Your Honor. We think it's a superior by law, but as we say in our brief, we think that ultimately this Court's precedents compel that the Court reject that. And I think most squarely, we look at the Farragher decision. We look at Lifeguard Silverman in Farragher, who had the authority to control all aspects of the victim's schedule and daily activities in a virtually unchecked manner. So if the Court's looking for an example that wants to point to someone who could qualify under the non-Seventh Circuit category, we think that Lifeguard Silverman from this Court's precedents would be the example that this Court would help out. That question wasn't presented. It was just assumed that Silverman would qualify as a supervisor. That's absolutely right, Justice Ginsburg. And I think for some of the reasons that Justice Kagan brought up in her colloquy with Mr. Srinivasan, I think the logic of the Court's precedents, the agency principles adopted, would lead to the conclusion that someone who does control virtually all aspects of one's schedule, but yet lacks the authority to hire, fire, demote, nevertheless still would be qualified as someone who triggered the carriageway. Roberts. Roberts. Every time you adopt a rule, rather than a multifactor analysis, there are going to be particular cases that fall outside the rule that look like a harsh result. Now, here it simply affects the nature. It doesn't give any immunity for harassment. It just affects the nature of the showing that might be made. You have no difficulty as representing an employer by saying that in every case an allegation of this sort is made, you have to go through a case-by-case description of the particular responsibilities, whether it's the thermostat, whether it's the music, whether it's the assignment of everything that the employee does, and decide on that basis whether or not you should compensate the victim or whether or not you should go to court? We do have great difficulty, Your Honor. First of all, if we're wrong about what this Court's precedents compel, then this Court should adopt the Seventh Circuit principle. And we've said that in our brief, if we're wrong on our understanding of the Court's precedents. Secondly, we think that the Court can and should establish meaningful limits on what this broader category of supervisors would require. And I think the case law illustrates that. If you look at the leading circuits who apply the standards. Roberts, I think your friend on the other side made a good point in his reply brief, which is the variety of circumstances you think courts should look at just happen to correspond with the factual issues that you would have resolved in your favor. Well, I would take issue with that. We tried to provide guideposts that would be helpful. But if you look at, for example, the principle that the EEOC agrees with, which is just that limited or marginal occasion authority to lead or oversee by virtue of a paper title that's great or a seniority is not sufficient. What does that have to do with agency? That's what I don't understand. Why do any of these tests have to do with agency? Well, Your Honor, I can understand Congress writing a statute that says, you know, any person given authority by the employer, which authority is used to make it more or sexual harassment, is bad. But the statute doesn't say that. It says apply agency principles. How does agency have anything to do with the line you're arguing that we take here? What this Court said in Faragher and Ellis, and I appreciate that you dissented in the case, but what this Court said was it adopted section 219.2d of the Restatement Second of Agency, the notion that if there was — if the employee was aided in the agency relation, that that would be the agency trigger for vicarious liability. Scalia, if that's what the agency is, then it's not aided at all. So the music would — the thermostat would qualify? I don't think it would, Your Honor, because we agree certainly with the EEOC that there are material limits to how far that principle could be stretched. The Court in Ellerth made clear that there were limits to the vicarious liability of employers in this context. Why? Why? I mean, if that's your principle, apply the principle. If you're aided, you know, you're going to work in a cold room unless you, you know, comply with my sexual advances. Apply the principle. What's so hard about that? That's a clear line. This is the balance I think that the Court struck in Ellerth, Your Honor, which was it took into account that the statute was passed against the backdrop of agency principles, but yet Congress also was cognizant that imposing vicarious liability on the employer for acts that the Court recognized were not themselves authorized by the employer, that that was a punitive aspect of that, and the Court would establish limits. And I think our position takes into account that there have to be limits in this area on the extent of vicarious liability in order to give effect to Congress's intent, but also recognizes in the situation like you had with the lifeguard in Ferragher, that that person did have authority that would assist in the harassment, date me or clean the toilets, as the lifeguard in Ferragher said. And so the Court, I think, struck a reasonable balance, and taking the balance in what this Court said, we think the proper way to resolve this case is to adopt something like the EEOC rule or the Second Circuit rule, but to make clear their limits, and the best way to make clear that there are limits is to make clear that on the record in this case, Ms. Davis did not qualify as a supervisor. Now, my friend said they didn't have the opportunity to develop evidence to the contrary, but the fact is from the outset they litigated this case as if the Seventh Circuit standard did not apply. The reasons that they gave for why Ms. Davis was a supervisor in the lower court was that, one, they pointed to the job description, that she had this other authority to, quote, lead indirect, and they also pointed to the fact that she didn't clock in. Those are irrelevant on the Seventh Circuit test. So all along they had in their mind that they wanted to try to show that Davis was different and did have some marginal authority to lead indirect. Alitoso, what guidance would your – what guidance would the kind of opinion that you're suggesting we write really provide? The guidance would be that if someone has no authority to assign daily work and that person isn't – and also has no authority to hire, fire, promote, et cetera, then that person isn't a supervisor. How much guidance is that? I think it's a lot of guidance, Justice Alito. I think that the flip side of that is the Court would make clear that merely having some occasional or marginal authority to lead or direct by virtue of one's better paper title or seniority is not sufficient to trigger vicarious liability. I think that's going to resolve the mind-run of the cases in which this question has come up and been litigated, at least to the courts of appeals. If you look at, for example, the difference between something like the Mack case out of the Seventh Circuit – Second Circuit and the Michels case out of the Fourth Circuit, Michels you had an example of two police officers, one had a higher paper rank, corporal versus private, and it was alleged that the corporal was a supervisor. And the Court said, no, no, no, he's not a supervisor. All there is is some marginal occasional authority. That's not sufficient. It was clear that the victim in that case wasn't shy about telling the harasser where to go to tell him off, and that's the kind of paradigm that this case fits into. Ginsburg. Why should that matter? I know you said that in your brief, Mr. Garre, that if the alleged victim talks back. But in one of the very first cases that we had in this line, Harris v. Forklift, there was – it was the boss, so there was no question about supervisor. And he was really making things hard for this employee, but she was very firm. And she talked back to him, but still, that's not what we said that counted. We said, is she being subjected to terms and conditions of employment that she would not be subjected to but for her sex? Garre, Right. And we don't think that that's a dispositive criterion. We recognize the point that a person could just have superior ability to stand up to despicable treatment. But I think what our point is, is that it's part of the equation that you would look at. In essence, did the person treat the alleged harasser like a co-employee, or did the person treat the alleged harasser like a supervisor? And in this case, the record is clear that she treated her like a co-employee, someone who they obviously had disagreements among them. And I think that's what we take this piece of evidence to assist the Court on the question presented. I think that we think what's sufficient to resolve the question presented is the clear and unrefuted evidence that the prep sheets, the daily activities were assigned by the chef or Mr. Kimes, that Mr. Kimes had the authority to control the schedule. And if you want to go further than that, the record also shows that Mr. Kimes had the authority to review, to do annual reviews. Mr. Kimes had the authority to evaluate. He had all the kind of authority that one would expect in a supervisor. And so you would ask the question, what's left? Essentially nothing. And whatever is left, we agree with the EEOC, is not, as a matter of law, sufficient to trigger vicarious liability. That doesn't mean she can't present her claim. It means that it's just simply analyzed under the framework for co-workers in which she bears the burden of establishing that the employer was negligent in not responding to it. And as Judge Wood for the Court of Appeals and Judge Barker made clear in their detailed opinions, this was not a situation where the employer stuck its head in the sand and ignored incidents of unpleasantries or, in some cases, despicable racial epithets. Alito If you were willing to concede that this would be a close case under the Second Circuit standard or under the EEOC guidance, then there might be an argument in favor of our applying those tests or one of those tests to the facts of the case. Because then that might provide some guidance, even though we are supposed to be a court of review, not a court of first view. But you're saying this is an extremely weak case under those standards, and therefore, what is what benefit is there in our applying this? Just send it back and have it done in the normal course by the court of appeals or by the district court. Well, Your Honor, we don't think it's a close case, but my friend does and his amici do, and I think the damaging signal that this Court would send by remanding on this record would be that whatever it might say in its opinion, that would have virtually no force in terms of establishing a standard that made clear that this — whatever else may be true about what would qualify, something like this does not qualify. And again, like this Court did in the Global Tech case, when the court establishes a standard, oftentimes it applies the standard to the facts and appreciates that that's the best way, the most judicial way of providing guidance on what that standard means. Sotomayor, there is one BSU internal document that — a note to the file by a compliance officer who apparently investigated one of the complaints that says that Kimes is recorded as saying, he's the — he's the avowed supervisor, that he, quote, knows Davies has given direction to Vance and that he just doesn't know what else to do. Doesn't that defeat summary judgment on its face? It doesn't, Your Honor, if you agree with our principle that the EEOC also agrees with, that having some limited or marginal authority to lead or direct as a matter of law is not sufficient, so that that piece of evidence, giving it its reasonable inference, would not be sufficient to create a material issue. It also wouldn't be sufficient, creating — looking at the body of the evidence, which makes crystal clear that the prep sheets are really what was driving the daily activities in this workplace, and it was Kimes or the chef that did the prep sheets, not Ms. Davies at all. And it's also not material in light of the evidence that Mr. Kimes did the schedule. Ms. Davies was asked at her deposition on page 135, quote, was there ever — have you ever been assigned to a less meaningful or fulfilling job classification? And her response was yes, and she pointed to an example by Mr. Kimes, because it's Mr. Kimes who had the authority to make those assignments, not Ms. Davies. And so the mere fact that you've got some marginal evidence drawn from snippets giving it a reasonable inference that she at times had some ability to lead or direct as the job description says by coaching demonstration overseen, is not sufficient as a matter of law to entitle her to a summary judgment, nor do we think that this Court should take the unusual step of remanding so that she can dig into events 6 years old through new discovery. Again—  Kagan. Kagan.  Kagan.        Kagan.  Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Who are balancing that question as to whether she at all didn't present or didn't develop evidence because of the nature of the Seventh Circuit standard? Well, first, I've looked at her summary judgment briefs, Your Honor, and in those briefs she argued that Davies was a supervisor because, one, under the job description she had the authority to lead and direct the same sorts of things that we're talking about now and would be talking about under the EEOC, and second circuit tests, and, two, she pointed to the fact that didn't clock in against something that's So this wasn't a case where the litigant felt themselves bound by a legal standard and one could surmise that they would have pursued it differently. I think I'd look at that first. And then I would look at her deposition transcript, which is in the joint appendix, and the three affidavits that she put in, in this case, which are in the joint appendix. At some point, you would expect her to come along and try to rebut the notion that Mr. Kimes and this fault assigned the daily activities through the prep sheets. In fact, it's just the contrary. If anything, in her own affidavit, she seems to accept that the prep sheets were done by Kimes and the chef. That's at JA 430. You'd expect her to contest the notion that Mr. Kimes was the one who did the scheduling, who did her annual reviews, who disciplined her on her occasion. After all, she was claiming that Davies was a supervisor and she didn't feel bound by the Seventh Circuit test. So you would expect to see some indication of how Ms. Davies actually assigned her something to do, changed her schedule, the like. Instead, what you find is all those sorts of allegations. She made them, but all those sorts of allegations were directed to Mr. Kimes. That was the basis for her retaliation claim, which isn't before the Court. But there are all the sorts of things that I'd expect one to complain about against a supervisor in this sort of vein. She made me cut vegetables instead of doing the baking like I like to do. She made me – she didn't assign me enough overtime so I couldn't make more money. She changed my hours. Those allegations were made. They were directed at Mr. Kimes, and that's perfectly consistent with the record evidence. There was a Kimes and the chef who had the authority to do her daily activities, and Kimes had the authority to do the schedule. It's not enough for her to come here today, I don't think, and just speculate that having an opportunity to go through greater discovery, which in essence would amount to a fishing expedition, the Court should take the unusual step of remanding to give her an opportunity for discovery. This Court, although we acknowledge oftentimes this Court does remand for the lower courts to undertake that inquiry, it certainly doesn't always do. So Global Tech is one example. We've cited many more in our briefs. And here I think, again, the parties, there's broad agreement on what the standard should be. Something like the EEOC or the Second Circuit test is, we think, the best way to frame it. But given the debate among the parties about what that test means and how it applies to Davis here, I think it's absolutely critical for the Court to apply the legal test to the record facts and hold that Ms. Davis is not a supervisor, and to affirm the judgment below. Although it's not before this Court, if one wanted to go to the next step and think about the affirmative defenses and the like, this isn't a case where the Court would be putting to rest a valid Title VII claim. The claim was extensively looked at below by Judge Barker and the district court, Judge Wood and her colleagues on the Court of Appeal. And they found an environment in which Ball State reacted responsibly to the allegations that were made, investigated them, and took prompt action where the investigation warranted it, particularly with respect to the most despicable things that were uncovered, racial epithets that were used by another employee, Ms. McVicker, not Ms. Davis. The only allegations against Ms. Davis that we think are relevant here during the time period that Ms. Davis was a part-time employee were one, the so-called elevator incident where Ms. Davis allegedly blocked Ms. Vance as she got out of the elevator, which isn't race-based at all, we don't think. And two, the alleged use of words like Sambo or Buckwheat to assert that Ms. Davis was a part-time employee. Ginsburg. Mr. Ortiz said it wasn't just part-time. He called my attention to the page before that said she also directed, that Davis also directed. Ortiz. Well, we disagree with that, Your Honor. If you look on page JA-12, the job description, position function, the last sentence says, requires leadership of up to 20 part-time substitute and student employees. So we think it's clear, and we said this in our red brief, and there wasn't any response to it in the yellow brief, that any authority, any conceivable supervisory authority could have only existed when Ms. Vance was a part-time employee. We don't think that that's relevant, Your Honor, because putting aside whether she had authority over catering assistants who were part-time or full-time, the record is absolutely clear that Ms. Davis just lacked the authority that would have been sufficient to trigger vicarious liability. And again, we think the paradigm case where that authority is present is something like the lifeguard and silverman, where they control all aspects of the daily activities, one's schedule, one's daily work assignments, and down the line. Here, there's no evidence that any of that authority that was possessed, and the record makes clear beyond doubt that all of that authority was possessed by others, Ms. Schein and Ms. — the chef and Mr. Kimes. And I think as Zemeckis' brief makes clear, this is consistent with workplaces across America today where jobs are less hierarchical, more collaborative, and so where you've got more senior employees by virtue of their experience or job title, just a paper title, are, in a broad sense, team leaders of the like in the workplace, that doesn't mean they're supervisors in any traditional sense, and it certainly doesn't mean they're supervisors for purposes of triggering vicarious liability under Title VII. So for those reasons, we would urge this Court to affirm the judgment below, to make clear in order to provide the needed guidance to the courts of appeals, an assumption that something like the EEOC or the Second Circuit standard does apply to determine who is a supervisor triggering vicarious liability. Ms. Davis, the only employee who's at issue, does not meet that standard. Roberts. Thank you, counsel. Mr. Ortiz, you have 4 minutes remaining. Thank you, Your Honor. Seventh Circuit rule is not one that can be justified in terms of its superior judicial manageability and administrability, despite producing a few odd results. As Justice Kagan's question revealed, it reads, it produces truly perverse results. Someone who can tell you what to do in your job day to day, during the whole job period. What kind of task you have to do is not necessarily considered a supervisor, while the person upstairs in human resources that you may never see or even know would be considered your supervisor. Kennedy, that, in fact, is one thing the Seventh Circuit has tried to do. But it dispels any kind of certainty and predictability in the rule, because the duty of care, of course, would be determined by a jury only after hearing a particular case. Second, my friend tries to get out from under the clear import of the job description here by saying directing and leading somehow don't count because that's accomplished through oversight. Oversight, however, is a very common synonym for supervision itself. It's merely a dog chasing its own tail. Third, it's no surprise that many of the things that Ms. Vance referred to, the particular instance she referred to, went back to William Kimes. Of course, that's related to the retaliation part of her claim, which is not before this Court. Also, Your Honor, Farragher, in the end, is not a toilet cleaning case. The district court did not find, made no finding on that. The court of appeals didn't mention it. This Court, in its Farragher opinion, mentioned only that it was an allegation in the complaint. And it's not clear the allegation in the complaint was that he said that, not that Silverman actually had that authority. And it was clear from the case he actually wasn't interested in even dating Farragher. It was just a way of humiliating her in the workplace. So just as with Farragher's precedent, it's not clear that that was even something that Silverman had authority to do. And finally, if this Court is worried about sending signals, think of what kind of signal it will be sending to litigants in the future, if it were to affirm, simply affirm here, in the future, whenever anyone is thinking that they may want to challenge a rule, no matter how well-settled it is in a particular circuit, they will have an incentive to, through discovery, to produce information that might be relevant to any future twist. Breyer, is there any he said that he went through, you weren't receiving on the first day, your client originally in the district court, not proceeding on the basis of the strict Seventh Circuit test, he had the EEOC look into it, the government itself says that we should affirm and they have EEOC lawyers on it, and so is there any piece of information that would be relevant that you know of that you would introduce were it sent back, say, to the district court that you have not already introduced? Well, Your Honor, first, the Solicitor General's office does not now take the position that affirmance is proper. It's actually not. Breyer, I read what they said in the last page of their brief. They said either affirm, that was their first thing, or send it back, okay? Now, my question remains the same. Yes, sir. Is there? Yes, there is. There is evidence. What is it? On page 197 of the joint appendix in the deposition testimony of Ms. Vance, she says that Davis told her what to do, what not to do. In the internal memo to the file that Justice Sotomayor pointed to, William Kimes, who had authority. I think Justice Breyer's question was what's not in the record. Oh, what's not in the record. I'm sorry, Your Honor. You have something that's not in the record that will materially add to this discourse. Yes. Yes, Your Honor. Thank you. In document number 62-3, which concerns the deposition testimony of another employee, is not in the joint appendix, which is the deposition testimony of another employee named Julie Murphy, Ms. Murphy testifies that Davis, quote, unquote, gave orders in the kitchen. That's on page 24, I believe. On page 38, she testifies that Davis was understood as a supervisor. And on page 37, she indicates that she received particular orders from Davis to do different things, like clean a particular piece of kitchen equipment at different times. That's all in the record in this Court? Yes. Just not in the joint appendix? Just not in the joint appendix, Your Honor. Thank you. Thank you, counsel. The case is submitted.